In the Matter of **TOPGALLANT LINES, INC.**, Debtor.

**AMBASSADOR FACTORS**, Plaintiff,

v.

**FIRST AMERICAN BULK CARRIER**, Defendant.

Bankruptcy No. 89–41996.
Adversary No. 90–4072.

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

Dec. 17, 1996.

John M. Tatum, Savannah, GA, for plaintiff.

Kathleen Horne, Savannah, GA, for defendant.

## ORDER

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

Pursuant to the terms of the Pre–Trial Orders entered by this Court on August 12, 1996, and August 30, 1996, a trial was held in the above-captioned adversary on September 27, 1996. At issue, as set forth in those orders, is the relative narrow question of whether the freights of the last voyage of the M/V Delaware Bay were earned by the Debtor and are, therefore, subject to security interest of Ambassador Factors.

## BACKGROUND

Debtor, Topgallant Lines, operated the freight carrier M/V Delaware Bay in repeating cycles approximately 22 days in duration between certain ports on the East coast of the United States and Europe. On the final voyage of the M/V Delaware Bay, the vessel took on cargo in New York, Baltimore, Norfolk and ultimately departed the Port of

Charleston bound for Europe at approximately 12:42 a.m., December 13, 1989. It was scheduled for arrival in Felixstowe, England by 8:00 a.m. on December 22, 1989. At approximately 1:00 p.m., on December 13, however, FABC, the vessel owner and charterer, wired the captain of the ship informing him that FABC was taking control of the vessel pursuant to its rights as the ship's owner. As a result, Debtor filed for protection under Chapter 11 at approximately 4:45 p.m., on December 13, 1989. FABC, after seizing control of the vessel, completed the voyage and discharged the cargo in Europe.

At issue in this case is whether the freights of the final voyage of the M/V Delaware Bay were earned by the Debtor or were earned by Defendant FABC following its takeover of the operations of the vessel. If the freights of the final voyage are deemed to have been earned by the Debtor then they become freights in which Debtor has an interest to which the Ambassador Factors' security interest attaches, subject to any superior maritime liens. If, on the other hand, the freights are deemed to have been earned by FABC, they would by necessity not have been earned by the Debtor, would not be property of the estate, and would not be subject to maritime lien claims, or Ambassador's security interest.[1] Instead those sums would be remitted directly to FABC.

As a result of pre-trial proceedings, the Court has held that freights of the final voyage of the M/V Delaware Bay totaled $1,307,738.00. Of that sum, $394,872.00 constituted proceeds of military cargo and $911,916.00 constituted proceeds of commercial cargo. This Order attempts to resolve the rights of FABC and Ambassador Factors in freights derived from both military and commercial cargoes.

I. *Military Cargo*

█ With regard to military cargo, the terms of the contract between Debtor and the Military Sealift Command (hereinafter "MSC") provided as follows: "Freight shall be *earned upon delivery* of the container to the ultimate destination set forth in the shipping order or applicable amendments (emphasis added)." *See Pre–Trial Order,* Doc. No. 366, page 4, fn. 2, Aug. 12, 1996. It is clear that the Debtor did not earn the freights derived from military cargo because although the ship was fully loaded and bound for Europe, FABC terminated the Debtor's rights to operate the vessel shortly after its departure from Charleston and several days prior to its arrival in Europe, which is the earliest point in time that Debtor would have delivered the cargo and earned the military freights. I, therefore, held in the Pre–Trial Order that FABC had made a *prima facie* case that it earned the military freights of the last voyage of the M/V Delaware Bay. *See Id.* The parties do not contest this issue and at trial Ambassador Factors offered no evidence to rebut the presumption established by the contract; however, Ambassador does dispute the amount that FABC earned from the last voyage.

In that regard, prior to the filing of the bankruptcy petition the contract between Debtor and MSC had been in effect for some time. As of the time of filing, Debtor contended that the MSC owed Debtor approximately $2,000,000.00 in freights, including freights earned during the final voyage of the M/V Delaware Bay and other voyages that preceded it. Accordingly, on February 19, 1990, the Debtor filed suit against the Military Sealift Command seeking recovery of $1,940,043.58 and the Trustee has pursued this matter since the date of conversion to Chapter 7 on December 17, 1990.

In response to the filing and service of this lawsuit, MSC tendered $708,326.00 to the Debtor which it conceded it owed for services rendered in accordance with the terms of the agreements between the parties. However, MSC disputed that it owed any of the remaining $1,231,717.58. That litigation proceeded and ultimately, by order entered August 26, 1996, this Court approved a settlement by the Chapter 7 Trustee, James L.

---

1. In the previous order's entered by this Court, affirmed by the District Court and Eleventh Circuit Court of Appeals, it has been established that Ambassador Factors holds a valid first perfected UCC based security interest in freights earned by the Debtor and that the security interest is subordinate to the claims of certain maritime lien interest holders.

Drake, Jr., of that litigation for the sum of $425,000.00. Out of that settlement, the Court authorized fees to attorneys of the Trustee in the amount of $141,666.52 and expenses of $2,835.32, reducing the net recovery against the MSC for transporting the military cargo to $280,498.16. The Trustee's settlement of $425,000.00 did not delineate what portion of the recovery was derived from the final voyage of the M/V Delaware Bay, which FABC earned, and what portion was derived from earlier voyages performed by the Debtor.

■ The present issue is how to allocate the net amount of the Trustee's settlement with MSC as between sums due the Debtor prior to the final voyage which the Debtor is entitled to recover, subject to Ambassador's security interest, and sums earned by FABC after it took over operation of the vessel. The net amount of the Trustee's claim against MSC was $1,231,717.58 and the case settled for $425,000.00 or 34.5% of that amount. Ambassador argues that the settlement funds should be treated as fungible as between final voyage proceeds and earlier voyages and that, at most, FABC should be paid 34.5% of the total less its pro rata share of the attorney's fees and expenses previously awarded.[2] FABC contends, however, and the Trustee testified, that in analyzing his $1.2 million claim against MSC, after factoring in set offs claimed by MSC, he believed that MSC owed Debtor $330,166.00 for pre-petition services and a net, after expenses attributable to the interruption of the voyage, of $315,935.00 in post-petition freights. Based on this, FABC argues that the settlement of $425,000.00 should be deemed to consist of approximately 50% pre-petition freights and 50% post-petition freights and therefore seeks an award of $212,500.00 less attorneys' fees and expenses. Moreover, FABC argues that because Ambassador caused the Trustee to ignore an opportunity to settle the case for $450,000.00 at an earlier stage in the proceedings and because substantial additional attorneys' fees were incurred between that time and the time the settlement occurred, that Ambassador should be surcharged for the $25,000.00 reduction in the settlement together with all of the additional attorneys' fees incurred.

In this regard the evidence revealed that the Trustee had what he believed was a firm offer of $450,000.00 to settle the case which he was prepared to recommend to the Court for approval. However, before he submitted the offer to the Court for consideration he inquired of counsel for the major parties in interest whether there would be an objection to settlement of the MSC claim in that range. He was informed that Ambassador would oppose the settlement because it believed it had documentation that would support a substantially higher recovery. In light of that information Trustee decided not to pursue the settlement in the amount of $450,000.00 and to continue the litigation.

Subsequent to that decision by the Trustee the United States withdrew its offer, filed a Motion for Summary Judgment, and took the position that it had no liability to the Debtor whatsoever. This Court entered an Order denying the Motion for Summary Judgment of the United States, and thereafter scheduled the case for a settlement conference in order to induce the parties to engage again in meaningful settlement negotiations. While clearly this course of events resulted in a slightly lower settlement and in substantially higher attorneys' fees, I deny FABC's request that those additional charges be surcharged to Ambassador. While it is easy in hindsight to argue for such a result, there is no showing that Ambassador in bad faith induced the Trustee to forego the opportunity to settle the case at an earlier stage for a higher sum of money, and there is no evidence that the Trustee acted in any way other than reasonably in responding to Ambassador's position in an effort to further investigate the merits and the value of this claim. In the absence of such evidence, I hold that it would be inappropriate to surcharge either Ambassador or the Trustee for the additional cost of litigation undertaken in good faith.

**2.** Ambassador actually stated in its post-trial brief that the figure should he 23.7% of the total claim of approximately $1.9 million. However, since $700,000.00 was paid pre-settlement, I will use the net claim of $1.2 million, as the basis for allocating the settlement percentage.

■ I do, however, agree with FABC as to the applicable portion of the settlement that should be deemed earned on the final voyage. Because the Trustee testified that the net claim he held consisted of approximately 51.1% pre-petition freights and 48.9% earned post-petition by FABC I hold that the net settlement should be allocated in like fashion. Based on the attorneys' fees and expenses awarded, the net settlement is $280,498.16. I, therefore, hold that 48.9% of that amount or $137,163.60 shall be deemed attributable to freights derived from military cargo earned post-petition and payable to FABC and that 51.1% or $143,334.56 shall be deemed attributable to pre-petition services related to military cargo and will be held by the Trustee as property of the estate.

### II. *Commercial Cargoes*

■ In regard to the $911,916.00 of non-military or commercial cargoes[3], the applicable term of the bill of lading reads as follows: "Full freight to the port or point of delivery under the transportation agreement shall be *completely earned upon receipt of the goods by the carrier* .... (emphasis added)" (Exhibit 38; Bill of Lading). Ordinarily, in the absence of a specific provision in the bill of lading, the so-called "American" rule, applicable to ocean freights, provides that freights are earned only upon delivery at the point of destination. However, in this case, the parties contracted to alter the American rule. Accordingly, I held in the Pre–Trial Order that Ambassador had made a *prima facie* case that the Debtor earned and therefore Ambassador's security interest attached to all the commercial freights. Ambassador Factors still contends that the terms of the bill of lading control and that Debtor earned all commercial freights. FABC does not refute that the "American" rule may be overridden by the terms of the bill of lading, but instead contends that the "financial instability rule" negates the language in the bill of lading, and that, therefore, as a matter of law, the "American" rule prevails. As stated in the Pre–Trial Order, FABC carries the burden of producing evidence to support that

contention. On this issue I make the following Findings of Fact and Conclusions of Law.

### *FINDINGS OF FACT*

1) Defendant, FABC, is a corporation wholly owned by the Marine Engineers Benefit Association ("MEBA"), an organization which provides pension and other benefits to seamen employed in maritime trades on U.S. flag vessels. In 1981 the MEBA Pension Trust decided to build two vessels to hold as an investment for the benefit of the trust beneficiaries. Those vessels are now known as the *M/V Chesapeake Bay* and the *M/V Delaware Bay*. Both ships were built in 1985 and the costs of construction were paid by MEBA. Thereafter they were sold to Chrysler Credit Corporation and leased back to FABC under an 18½ year lease with payments averaging approximately $6 million per year. Ultimately they were chartered to U.S. Lines on a long-term charter. Unfortunately, U.S. Lines filed bankruptcy and MEBA/FABC had to find another entity interested in chartering the vessels. The vessels were thereafter chartered to Topgallant Group.

2) Jack Abrams, the principal shareholder of Topgallant Group, testified that he negotiated with FABC to lease its vessel after becoming reasonably assured that he would be awarded a MSC contract. During these negotiations, FABC did not request a copy of any financial information from Abrams. Rather, FABC's apparent concern in chartering the vessels to him was that adequate security be provided to protect the vessel against lienable claims. FABC employed management consultants to formulate a strategy for the use of the vessels by a different lessee following the bankruptcy of U.S. Lines. Their report identified Topgallant Group as a "prime contender" for the use of FABC's vessels in 1987 (Exhibit No. 25).

3) The consultants attempted to establish reasonable charter hire rates based on their understanding of the market, but acknowledged that the market for U.S. Flag vessels

---

**3.** The Court previously has ruled that a *prima facie* showing has been made that $911,916.00 held by the Trustee constitutes proceeds of non-military cargo. The entire $911,916.00 attributable to commercial freights has been collected and is in the hands of the Trustee.

was more difficult to value than for non-U.S. Flag vessels. At the time the reports were issued the consultants were never given any of Topgallant Group's financial information. Testimony revealed that the consultants acknowledged that financial weakness of the potential vessel charterer would be a matter of concern. However, the focus of the report was to determine whether the terms of the charter were as good as those that might be obtained in an arm's length transaction, a factor which had to be established in order for the MEBA trustees to agree to the transaction, and not to analyze the capital structure of the chartering organization. Essentially, FABC's only choices were to lease the vessels to Topgallant Group or permit them to lie idle at a much more severe financial loss to FABC. In fact, the continuing obligation to make lease payments to Chrysler was a driving force in entering the original charter agreement since FABC needed the cash flow in order to fund that obligation.

4) At some point the financial viability of Topgallant Group became uncertain and through a rather complicated series of transactions, Topgallant Lines became the vessel operator under the charter party with FABC. Specifically in April 1989, Frank Peeples, who apparently had been approached about investing in Topgallant Group met with Jack Abrams, the controlling shareholder in Topgallant Group, Myron Mintz, attorney for FABC, and Pomeroy Williams, Mr. Peeples' attorney, in a lengthy series of meetings. Peeples testified that Mintz wanted Peeples to take over the ships via the assumption of an equity position in Topgallant Group, but Peeples, lacking knowledge of the total financial picture of Topgallant Group, refused to do so unless he could do business through a new company. Then, on or about April 4, 1989, Abrams transferred his stock in Topgallant Group to Myron Mintz, FABC's counsel. After Mintz acquired the stock he elected Frank Peeples president and chairman of Topgallant Group. He then transferred his stock, in consideration of the receipt of $1,000.00, to Gaston Holdings, a company whose sole shareholder is Mr. Williams' secretary, Betty Ann Tally, and whose president is Pomeroy Williams. Mintz had been informed during the course of these meetings

that the charters between FABC and Topgallant Group would be transferred to Topgallant Lines, a corporation originally incorporated and formed under the name Universal Shipping and Trading. Its shareholders were all members of Mr. Peeples' family. The end result was that Topgallant Lines acquired the charters of Topgallant Group for consideration, but without assuming any of the extended liability of Topgallant Group.

5) At the time of this April 1989 transfer, FABC was made aware that Topgallant Lines would be a minimally capitalized company and FABC never made further inquiry concerning the financial strength of Topgallant Lines. Peeples advised Mintz that he would have minimum capital, but would operate the company utilizing the accounts receivable and credit extended by Ambassador Factors and Mintz agreed to this arrangement. In June 1989 an addendum to the charter party was effectuated which transferred control of the vessels from Topgallant Group to Topgallant Lines, which had already been operating the vessels following the April transaction with FABC's knowledge and consent. Unfortunately, following the acquisition of the vessels by Topgallant Lines, the business was not operated profitably.

6) In connection with Topgallant Lines' acquisition of the charter to the two vessels, Lines contends it paid approximately $7 million in debt of Topgallant Group and in exchange received what Mr. Peeples estimated to be approximately $2 million in assets including a $1.6 million deposit to secure a line of credit issued in favor of FABC to protect against attachment of maritime lien claims on its vessel. As early as October 31, 1989, in meetings between Topgallant Lines and FABC, Lines conceded that it was in default under the terms of the charter party for not fully paying all lienable claims. FABC took no action to terminate the charter. Instead, an agreement was reached as to how Lines could bring itself into compliance with the terms of the charter party and the charter hire was increased at that time. Under the charter agreement, FABC had the right to, and in fact did, hire the accounting firm of Coopers and Lybrand to review the accounts

payable of Topgallant Lines on a regular basis in order to insure that lienable charges were being timely paid or, presumably, that they did not exceed the $1.6 million line of credit posted in favor of FABC to protect it.

7) Peeples acknowledged that Topgallant Lines was a family business and that he made the decisions concerning the conduct of the business. By early December 1989 he realized that Topgallant Lines was 'running out of gas,' as he put it, and that it probably could not operate under the existing arrangement with FABC beyond late December of that year. Around December 5 he advised his children to resign their position as officers of the corporation and on or about December 11 he asked his counsel, Pomeroy Williams, to meet with FABC to determine whether a moratorium on certain obligations to FABC might be arranged in order to keep the business operating.

8) After Peeples instructed Pomeroy Williams to attempt to make financial arrangements with FABC to continue the company in business Williams traveled to Washington, D.C., and met on the December 12 and 13 with FABC/MEBA representatives. He asked them to agree to a moratorium on payments which totaled approximately $600,-000.00 per month per vessel or, alternatively, that FABC/MEBA release some of the $1.6 million cash which secured the line of credit, or otherwise make cash available to the company. Between December 5 and December 11, 1989, Ambassador Factors had advanced over $700,000.00 to Topgallant Lines under its existing arrangement for financing of Lines' accounts receivable, but by December 12, Williams told FABC that Ambassador was unwilling to advance additional funds with which to operate the company.

9) At the time the M/V Delaware Bay set sail from Charleston in the early morning hours of December 13, 1989, Williams was still in Washington, D.C., meeting with representatives of FABC and MEBA. He had met with representatives of FABC and MEBA beginning at approximately 8:00 p.m., on December 12, requesting the moratorium or other financial concessions in order to permit Topgallant Lines to continue in operation. FABC/MEBA representatives were unable to give him an answer. Instead, they agreed to meet again on the morning of December 13 at the offices of MEBA. At approximately 10:30 a.m., Williams again outlined the financial situation. Tom Dillon, an attorney for FABC, questioned what the status of the ships was at that time and Williams advised that the M/V Chesapeake Bay was in Europe and that the M/V Delaware Bay was at sea. Dillon then advised the employees of FABC to seize both ships pursuant to FABC's rights under the charter party.

10) At the time of the departure of the vessel the ship was fully fueled and provisioned for the overseas voyage. Although not all expenses had been paid for in advance, the Debtor had posted, as part of its arrangement with FABC, a $1.6 million line of credit to secure its obligations to pay lienable claims and that line of credit was in effect at all relevant times. Mark Siegel, FABC's comptroller, testified that after FABC took control of the Delaware Bay, it was called upon to pay expenses of the final voyage which substantially exceeded the $1.6 million line of credit which was in place to protect FABC.

11) Although Topgallant Lines' management realized that filing a Chapter 11 might become a necessity, at the time Williams went to Washington to attempt to obtain financial concessions on behalf of the company, they believed that short-term financial problems would be solved if cash were infused in the company from the line of credit deposit or by a moratorium on charter hire payments. When that relief was refused by FABC and the ships were seized, Topgallant believed its only option was to file Chapter 11 bankruptcy.

12) The short-term financial problem according to John Benton, chief financial officer of Topgallant Lines, had arisen because the company had been temporarily denied the right to carry MSC cargo. This deprivation of regular cash flow had put Lines in a state of distress, but by the time of the seizure of the ships by FABC, Topgallant Lines had been restored to participation as an MSC contract carrier. Benton estimated their short-term cash needs as about $2 million but

believed with a couple of "good voyages" this deficit, which amounted to approximately 2% of annual revenues could be made up. According to Benton neither he nor anyone else connected with Topgallant Lines knew that seizure of the vessel was imminent when it set sail from Charleston but rather that it had set sail in the ordinary course of its commercial activity after all cargo had been loaded.

### CONCLUSIONS OF LAW

Upon these facts, the Court is called upon to apply the "financial instability" rule in a case where the carrier was clearly operating on the thinnest of margins, and when its principals had engaged in an elaborate series of acts to shield themselves from liability, yet where the vessel owner, not the shipper of cargo, asserts the rule, and where the vessel owner had substantial participation in the formation of the carrier and access to information relating to the financial health of the carrier. As usual in this case, there is no clear precedent.

The result argued for by FABC derives from the maritime rule that a guaranteed freight clause is not absolute:

> Even if the parties agree to insert a guaranteed freight clause into the bill of lading, however, the carrier's right to the freight is not absolute. "What the parties intend is that the carrier shall keep the freight, even if he does not deliver the cargo, unless the failure to deliver be due to the carrier's fault...." Carriers are bound, however, to exercise "reasoned judgment" in the commencement and abandonment of the voyage, that is, judgment "reasonable ... under the circumstances existing and reasonably foreseeable at the time the judgment is made."
>
> Unreasoned judgment sufficient to oust a guaranteed freight clause may be shown by a voluntary deviation in the planned course of the voyage ... or by the unseaworthiness of the vessel that is known to the carrier and prevents the vessel from completing the voyage....

*Mare Schiffahrtskontor GmbH & Co., KG, v. M/V Oceanhaven, et al.,* 763 F.2d 633, 637 (4th Cir.1985) (citations omitted).

In that case a vessel en route from Baltimore to Antwerp was arrested in Rotterdam, an intermediate port of call. The shippers goods were trans-shipped the final seventy-five land miles at a cost of $11,000.00. Freight charges contracted for totaled $22,-000.00. The Fourth Circuit Court of Appeals held that the unreasoned judgment concept may be applied to cases that concern the "financial instability" of a maritime carrier.

Although the parties have not cited and we have not discovered any federal circuit case on point, we believe that the district court correctly concluded that a *carrier's commencement of a voyage in the face of financial instability that may force the termination of the voyage prior to its contractual destination could constitute "unreasoned judgment."* The reasoned judgment rule is applicable in situations when "the ship's ability to make its voyage was in doubt," *see T.J. Stevenson [& Co. v. 81,193 Bags of Flour],* 629 F.2d [338] at 378 [(5th Cir.1980)]. and plainly this ability may be as seriously impaired by financial weakness as by physical weakness....

> If the term "seaworthiness" connotes simply a vessel fit to perform as she promises, and if the strong probability exists that her voyage will be interrupted by litigation, we hold that the vessel is unseaworthy at the start of her voyage.

*Mare Schiffahrtskontor GmbH & Co. KG v. M/V Oceanhaven, et al.,* 763 F.2d at 638 (citations omitted).

However, the Court, unwilling to hold that unreasoned judgment had occurred as a matter of law in the absence of specific findings regarding the nature of a carrier's financial troubles, remanded the case for a specific determination of "the reason for the seizure ... and any efforts [the carrier] may have made to forestall the seizure ...," as it was "impossible for [the Court] to conclude that [the carrier] was aware or should have been aware that the vessel was liable to be stopped short of its contractual destination." *Id.* at 639. *See also Drew Ameroid International v. M/V Green Star,* 681 F.Supp. 1056 (S.D.N.Y.1988) (Loading of cargo was completed and bill of lading was issued *after*

vessel arrested. Creditors sought writs of attachment against freights owed by shipper under guaranteed freight clause, who defended on basis that it had subsequently arranged and paid for substitute transportation. Held, on these facts that shipowner and its creditors could not recover freight.)

 The doctrine recognized in these two cases is equitable in nature, but the factors governing its application are not fully developed due to the few cases which have analyzed it. Those factors which a court must consider to determine whether a maritime carrier exercised "unreasoned judgment" are:

1) The nature (and presumably the severity) of the financial trouble;

2) The reason for the seizure or other non-completion of the voyage;

3) The foreseeability of the failure to complete the voyage;

4) The degree of effort undertaken to forestall the seizure;

5) The degree to which a shipper has incurred additional expenses to secure delivery of the cargo.

Ambassador first contends that since FABC was not the shipper of goods it cannot invoke the doctrine—in effect that FABC lacks standing. It is true that the parties to the prior cases have never included someone in the precise position as FABC, and thus it is uncertain whether the Fourth Circuit would have extended the doctrine of "unreasonable judgment" to protect a non-shipper. I am not prepared, however, to deny relief on such narrow and unsteady ground. FABC is a creditor of the carrier, just as a shipper is, and I can discern no principled basis on which to hold that it lacks standing.

 I do, however, find factually that Topgallant Lines did not exercise unreasoned judgment in taking on cargo and commencing the voyage and, therefore, as applied to the facts in this case, I hold that the doctrine does not apply so as to oust the guaranteed freight clause of the bill of lading. Topgallant Lines was unquestionably in severe financial distress. However, it was not foreseeable when the ship left Charleston that it could not complete the voyage. It was fully

provisioned, loaded, and there was no reason to delay its departure. It did not accelerate its departure to avoid arrest. It was nearing the end of the road financially, yet Ambassador continued to advance substantial funds even as late as December 11. Topgallant Lines believed its cash flow problems were temporary in nature and dispatched counsel to Washington, D.C., to negotiate for interim concessions. FABC had not refused the request at the time the ship sailed. While Debtor's long-term financial problems were severe, its failure to complete this particular voyage was not foreseeable, and Debtor had undertaken substantial efforts to forestall the seizure. I therefore hold that the financial instability rule does not apply in this case.

Additionally, FABC, though it cannot be faulted for the decision to seize the ship or for its earlier efforts to continue these ships in commerce in order to pay its debt to Chrysler Credit, was no unsuspecting third party in terms of Topgallant Lines' financial health. It chartered the vessels to a known, thinly capitalized, company. It had the right to monitor the accounts payable of Topgallant Lines to protect itself against lienable claims which would exceed the $1.6 million line of credit it held to cover that risk. It knew by October 1989 that Lines was in default of certain financial terms of the charter party. It permitted Lines to operate the vessel even after the charter term expired. More important, in contrast to the cases relied on by FABC, the party asserting this doctrine, was the very party which assumed control of the *M/V Delaware Bay*, redirected it from two intended ports to Bremerhaven, and incurred costs for which it now requests priority compensation. Clearly, the fact that the interruption or re-routing of the voyage occurred at the direction of the party seeking to assert the financial instability rule, in contrast to some third party, weighs against FABC.

After weighing the five factors enumerated above, I find that the preponderance favors a holding that the financial instability rule does not apply. Therefore, I hold that FABC has not carried its burden of proving that the guaranteed freight clause is unenforceable. Accordingly, as provided in the terms of the

bills of lading, Topgallant Lines earned the freights of the final voyage of the *M/V Delaware Bay* and the sum of $911,916.00 will be disbursed by the Trustee to Ambassador and maritime lien claimants, along with other freights held by the Trustee in accordance with previous rulings in this case.

### *ORDER*

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THEREFORE ORDERED that the Trustee release the sum of $137,163.60 to First American Bulk Carrier, and administer the sums of $143,334.56 and $911,916.00 as estate property, subject to the secured claims of Ambassador Factors and maritime lien claimants.